# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SHARON J. POLCHOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 10 CV 6525** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **Magistrate Judge Young B. Kim** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **May 19, 2011** |

## MEMORANDUM OPINION and ORDER

Before the court is the motion of plaintiff Sharon Polchow ("Polchow") for summary judgment. Polchow seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2). Polchow submits that there is no genuine issue as to any material fact and requests that the court reverse the Commissioner's decision and award her benefits. For the following reasons, Polchow's motion is denied:

### Procedural History

Polchow applied for DIB on January 9, 2008, alleging that she became disabled on December 11, 2007, because she suffers from idiopathic thrombocytopenic purpuria ("ITP") (a blood condition marked by an abnormally low platelet count). (Administrative Record ("A.R.") 75, 76, 93, 154-58.) Her application was denied initially on April 17, 2008, (id. at 75, 89-93), and again on reconsideration on October 27, 2008, (id. at 76, 112-14).

Thereafter, Polchow filed a timely request for a hearing on November 4, 2008. (A.R. 116-17.)

An administrative law judge ("ALJ") held a hearing on October 26, 2009. (Id. at 27-74.) Polchow appeared and testified at the hearing. (Id. at 29.) Dr. John Cavenagh, a medical expert ("ME"), and Chrisann Geist, a vocational expert ("VE"), also testified at the hearing. (Id. at 47, 59.) On January 12, 2010, the ALJ issued a decision finding Polchow not disabled. (Id. at 8-22.) Polchow then requested a review of the ALJ's decision, and on September 10, 2010, the Appeals Council denied her request making the ALJ's decision the final decision of the Commissioner. (Id. at 1-3, 6-7.) Pursuant to 42 U.S.C. § 405(g), Polchow initiated this civil action for judicial review of the Commissioner's final decision. The parties have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). (R. 9.)

**Facts**

**A.    Medical Evidence**

In February 2006, Polchow sought emergency medical treatment for acute left flank pain that radiated to her left lower side. (Id. at 310-19.) She reported that the pain started the day before and she had been feeling nauseous. (Id. at 312.) The emergency room physician consulted with Polchow's primary care physician, Dr. Karen Spurgash, and prescribed her Toradol IV (nonsteroidal anti-inflammatory medication), which significantly relieved her pain. (Id.) An x-ray of Polchow's lumbosacral spine showed a satisfactory alignment, well-preserved disc heights and no fractures or bone destruction. (Id. at 319.) A

blood test produced negative results (A.R. 318), but a urine analysis showed a moderate result for the presence of infection, (id. at 314). In the same month, a bone mineral density study of Polchow's lumbar spine showed osteopenia with a "7.9% decrease in the lumbar spine as well as 5.2% decrease in the left femoral neck" as compared to a 2003 study. (Id. at 305-07.)

From April 2006 to December 2006, Polchow underwent periodic blood testing, (id. at 284, 293-94, 297, 301, 303), urine testing, (id. at 299, 301-02, 304), bone density studies of her spine and hip, (id. at 290), and an x-ray of her sinuses, (id. at 283), which showed only mild abnormalities. Polchow complained of right knee and right lower leg pain during this period, but an x-ray of her right knee showed only mild tri-compartmental degenerative changes and small marginal osteophytes with "no displaced fracture, dislocation or significant joint effusion." (Id. at 286.)

In February 2007, Polchow was treated by Dr. Joseph Allegretti, an ENT, for postnasal drip with nasal congestion and facial pressure. (Id. at 547.) Dr. Allegretti assessed Polchow with nasoseptal perforation. (Id.) A CT scan did not reveal any evidence of sinusitis. (Id.) Dr. Allegretti's treatment notes indicate that Polchow underwent an audiogram in 2006, which revealed a symmetric high frequency sensorineural hearing loss. (Id. at 548.) His notes also reflect that Polchow's sleep study showed a lowest oxygen saturation of 90 percent and that she was required to use a continuous positive airway pressure ("CPAP") machine. (Id.)

About one month later, in March 2007, Polchow complained of two episodes of transient left eye vision blurring, vertigo, tinnitus, and headaches. (A.R. 525-26.) Dr. Jeffrey Curtin, a neurologist, treated Polchow and ordered an MRI of the brain and a magnetic resonance angiogram ("MRA") of the intracranial vessels. (Id.) Both scans produced normal results with the exception of mild mucosal thickening in the ethmoid air cells and fluid within the mastoid air cells. (Id. at 526.)

In June 2007, Dr. James Schlenker (plastic surgeon and hand specialist), diagnosed Polchow with bilateral carpal tunnel syndrome. (Id. at 444-45.) Polchow reported that her symptoms began about three years earlier and gradually became more severe. (Id. at 444.) She first noticed numbness and tingling while working, but her symptoms later began to bother her at night and would wake her up. (Id.) Dr. Schlenker attributed Polchow's pain between her shoulder blades to a manifestation of neurogenic thoracic outlet syndrome. (Id. at 445.) He notified Polchow's employer that she needed an ergonomic workstation and should take three minute breaks every half hour to do exercises for her condition. (Id.)

The following month, in July 2007, Polchow sought emergency medical treatment because of fatigue, weakness and parasthesia in her arms. (Id. at 253-71.) Polchow reported that she recently had a sore throat and upper respiratory symptoms and felt like she was coming down with a "bug." (Id. at 254.) The attending physician ordered several diagnostic tests including an EKG, echocardiogram, and Doppler study, which showed normal heart function. (Id. at 253, 411-12.) Polchow's examination and other tests results were

unremarkable but the attending physician diagnosed her with sleep apnea, increased fatigue, and anxiety. (A.R. 253.) Polchow's noncompliance with the use of a CPAP machine was also noted. (Id.)

In September 2007, Polchow underwent an MRI of her internal auditory canals as a result of left side tinnitus and right ear pain. (Id. at 580.) The MRI revealed normal results with the exception of extensive fluid opacifying the mastoid air cells bilaterally. (Id.) Polchow also had an MRI of her lumbar spine to investigate her complaint of left side back pain radiating down the anterior of her left leg. (Id. at 519.) The MRI showed no significant abnormalities or any evidence of intervertebral disk herniation or lateralizing defect. (Id.)

In October 2007, Polchow sought emergency medical treatment for nausea, weakness and chills. (Id. at 373-76.) She reported having these symptoms on and off for several hours. (Id. at 375.) Polchow also had an episode five days earlier where she felt her heart skipping and had shortness of breath, but she did not have any palpitations, chest pain or shortness of breath in the emergency room. (Id.) She explained that she had not been working for six weeks because of some type of viral illness and had returned to work two and a half weeks earlier. (Id.) The attending physician ordered a number of diagnostic tests, which included a CT scan of the head with sinus cuts, an EKG, a blood profile, and an urinalysis. (Id. at 376.) A physical examination and tests showed normal results, but Polchow's hearing in her right ear was slightly decreased as compared to her left ear hearing. (Id. at 375-96.) She was

diagnosed with viral syndrome—a diagnosis a physician may use when symptoms suggest a viral illness, but the specific virus is not determined. (A.R. 376.)

Polchow continued to complain of palpitations, weakness, numbness, and abdominal pain in October 2007. (Id. at 370-71.) CT scans of Polchow's abdomen, pelvis and chest revealed no abnormalities with the exception of occasional diverticula of the sigmoid colon. (Id. at 371.) Then, in December 2007, Dr. Miriam Redleaf, a neuro-otologist, ordered an MRI of the brain and auditory canals because of Polchow's complaints of ear pain, numbness, tinnitus, and hearing loss. (Id. at 332.) The MRI showed normal results except for an inflammatory signal within her bilateral mastoid air cells. (Id.) The MRI also indicated a possible brainstem lesion, but a second test did not show any lesions. (Id. at 328, 331-33.) Later that month, Polchow had another set of diagnostic tests, including a blood profile, (id. at 351-52, 354-55), and cardiac monitoring, (id. at 356). These tests did not show any abnormalities. (Id.)

In January 2008, after completing a hand and arm function evaluation, Dr. Schlenker assessed Polchow with recurrent carpal tunnel syndrome. (Id. at 439, 441.) He notified Polchow's employer that if her symptoms of pain and parethesias recurred or if a cortisone injection did not alleviate her symptoms, she would require right carpal tunnel release. (Id. at 440.) An MRI of the right wrist showed the possibility of a ganglion on the volar aspect of the radiocarpal joint, but no other abnormalities were found within the wrist joint. (Id. at 437.) Several weeks later, in February 2008, Dr. Redleaf noted that Polchow's right ear

clogging and pain had been resolved. (A.R. 330.) Polchow was also treated at about the same time with Dr. Oswiecimski because of recurrent infections, sinus problems, nausea, and anxiety. (Id. at 628.) She was prescribed Evista (osteoporosis), Klor-Con (irregular heart beat), and Xanax (anxiety) for her symptoms. (Id.)

Polchow had right side endoscopic carpal tunnel release surgery in March 2008. (Id. at 452-54.) Polchow subsequently underwent right hand therapy, (id. at 448, 456-57), and Dr. Schlenker reported that she was progressing satisfactorily, (id. at 436). About six weeks later, Polchow had left side endoscopic carpal tunnel release surgery after an electromyography ("EMG") and nerve conduction study confirmed she needed the surgery. (Id. at 17, 449-51.) After the surgeries, Polchow did not have any complaints about her left hand, but complained of swelling and pain in her right hand. (Id. at 447.) She later reported that her right hand improved with therapy and Dr. Schlenker opined that she could perform light duty work and lift up to 10 pounds with either hand. (Id. at 448.)

In April 2008, Polchow had an internal medicine consultative examination with Dr. M.S. Patil. (Id. at 416-19.) She reported being diagnosed with ITP, but that it was in remission and that her most recent test results indicated "everything looks OK." (Id. at 416.) Polchow also explained to Dr. Patil that she experienced mild pain in her hands and quit working as an executive administrative assistant because she often became sick with colds and infections. (Id.) Dr. Patel noted that Polchow was in no acute distress and her speech and gait were normal. (Id. at 417-18.) Her neurological examination was unremarkable and

she had no difficulty with fine and gross manipulative movements of the hands and fingers. (A.R. 418.) Polchow's lumbar spine range of motion was normal except for somewhat limited flexion. (Id. at 417.) She was able to squat and rise and perform tandem and heel and toe walking. (Id. at 419.) Dr. Patel also noted that Polchow's prior medical tests showed normal results. (Id.)

Dr. Charles Wabner, a state agency medical consultant, also reviewed Polchow's medical records in April 2008 and completed an Illinois Request for Medical Advice. (Id. at 420-22.) Dr. Wabner reported that Polchow did not have any severe impairments, (id. at 420), and her dexterity for fine and gross manipulations was maintained, (id. at 422). He also noted that Polchow's most recent laboratory results were within normal results and no physical limitations had been identified during the consultative examination. (Id.)

Dr. Oswiecimski's treatment notes for the same month show that Polchow experienced right arm bursitis, sinus congestion, lower extremity and left side pain, numbness, peripheral neuropathy, and anxiety. (Id. at 622-23.) Polchow also reported to Dr. Curtin that she had lower back pain radiating down her left leg. (Id. at 487, 508.) An MRI of Polchow's lumbar spine revealed only mild degenerative changes and no evidence of significant spinal stenosis or intervertebral disc herniation. (Id. at 508.) Then, in May 2008, Dr. Curtin ordered a sensory nerve conduction study because Polchow complained of left leg pain and numbness. (Id. at 506-07.) The study produced normal results. (Id.)

Polchow also sought treatment from Dr. Robert Fliegelman, an infectious diseases specialist, in May 2008, as a result of having constant viral illness, fatigue, and headaches. (A.R. 564-65.) He diagnosed fatigue with episodic leg weakness and numbness with differential diagnoses including rheumatologic process (polymyositis vasculitis), systemic viral illness, and chronic fatigue syndrome ("CFS"). (Id. at 565.) His treatment notes reflect the fact that while Polchow continued to report fatigue, her immunological testing was normal and there were no significant findings noted during her examinations. (Id. at 504-05, 564.)

About two months later, in July 2008, Polchow underwent diagnostic testing for osteopenia and osteoporosis. (Id. at 502-03.) The bone density scan of her lumbar spine and left hip produced normal results. (Id. at 502.) Towards the end of July 2008, Polchow complained to Dr. Fliegelman that she had another episode of incapacitating fatigue and spent the weekend in bed. (Id. at 561.) Treatment notes show that Polchow's fatigue seemed to be triggered by viral infections and Dr. Fliegelman was concerned about a "deep infection." (Id.) A leukocyte scan of Polchow's lower leg performed in August 2008 indicated an intense ovoid soft tissue uptake of the left lower leg anterior to the distal tibia. (Id. at 501.) In the same month, Polchow was treated by Dr. Oswiecimski for chills, fatigue, heart palpitations, dyspnea, and difficulty in catching her breath upon waking. (Id. at 621.) An EKG showed normal sinus rhythm, and a blood profile produced normal results. (Id. at 639-41.)

In September 2008, Dr. Curtin completed a Neurological Report at the request of a Disability Determination Services' adjudicator. (A.R. at 462-67.) Dr. Curtin diagnosed Polchow with fibromyalgia and noted that her mental status was normal apart from a depressed mood. (Id. at 462.) He reported that Polchow has normal movements, no atrophy, no motor abnormalities, and no coordination or cranial nerve abnormalities. (Id. at 462-63.)

In the same month, Polchow was treated by Dr. Roland Winterfield, a cardiologist, because she had episodes of awakening at night and "gasping for air." (Id. at 589, 596.) An overnight polysomnogram was performed, which showed mild obstructive sleep apnea syndrome, with Polchow's sleep architecture assessed as being abnormal. (Id. at 495-96.) A myocardial perfusion study, (id. at 597-98), a cardiac stress test with isotope, (id. at 606), an EKG, (id. at 607), and an echocardiogram and Doppler study, (id. at 608-09), showed normal results with the exception of lower than normal left ventricular systolic function and trace mitral regurgitation, (id. at 609). The EKG showed good exercise capacity and normal sinus rhythm even though Polchow stopped exercising during the test because of fatigue. (Id. at 607.) The diagnoses included mild sleep apnea and possible nocturnal panic attacks. (Id. at 494.) Polchow was to continue taking Xanax, but a CPAP machine was not recommended. (Id.) A 14-day continuous monitoring of Polchow's heart performed several months later showed no indication of paroxysmal supraventricular tachycardia and sinus rhythm was maintained with intermittent sinus tachycardia. (Id. at 599, 603-05.)

In October 2008, Dr. Bharati Jhaveri, a state agency medical consultant, reviewed Polchow's medical records and completed an Illinois Request for Medical Advice. (A.R. 479-81.) Dr. Jhaveri noted that Polchow's disability claim was being denied because her impairments, which included fibromyalgia and bilateral carpal tunnel syndrome, were not expected to last more than 12 months and were also expected to be non-severe at the end of this period. (Id. at 479.) He explained that Polchow's bilateral carpal tunnel release surgery resulted in significant improvement in her symptoms and that she had normal muscle strength, no atrophy and her movements were within normal limits. (Id. at 481.) Dr. Jhaveri therefore concluded that Polchow would make a successful recovery before the completion of the 12-month period. (Id.)

Several weeks later, in November 2008, Polchow complained of dizziness, vertigo, and transient arm weakness to Dr. Oswiecimski. (Id. at 627, 632.) An MRI of the brain showed normal results with the exception of chronic bilateral mastoiditis, an infection of the mastoid bone behind the ear. (Id. at 632.) The following month, in December 2008, Polchow complained of eye, ear, and knee pain. (Id. at 620.) Dr. Oswiecimski diagnosed her with acute chronic sinusitis and prescribed Omnicef (antibiotic) to resolve her symptoms. (Id.) An x-ray of the right knee was negative except for a minimal patellar spur. (Id. at 631.) In the same month, Dr. Fliegelman diagnosed her with acute otitis media and fatigue, and noted Polchow's medications included Lyrica (pain), Klor-Con, Xanax, Omnicef, and Crestor (cholesterol). (Id. at 555-56.)

11

Dr. Oswiecimski treated Polchow in January, March, and June 2009, for ear pain, sinusitis, a sore throat, laryngitis, and peripheral neuropathy. (A.R. 617-19.) An MRI of the brain in July 2009 produced normal results except for an inflamed right mastoid. (Id. at 658.) Then, in August 2009, Dr. Oswiecimski completed a medical questionnaire indicating that Polchow was not capable of performing full-time work. (Id. at 666.) Several weeks later, in September 2009, Dr. Curtin completed a similar medical questionnaire opining that Polchow was not capable of performing full-time work. (Id.)

**B.     Polchow's Testimony**

Polchow was born on September 21, 1952, and was 57 years old at the time of the administrative hearing. (Id. at 32.) She completed high school and took some night college courses. (Id. at 33-34.) Polchow worked as an administrative assistant at CNA Insurance Company ("CNA") from October 1981 to December 2007. (Id. at 34, 242.) Polchow stopped working and took early retirement because she felt sick. (Id. at 34-35.) She receives a monthly retirement income of about $1,100, which is her only source of income. (Id. at 34.)

As an administrative assistant, Polchow performed a number of diverse job duties, including stocking office supplies, scheduling teleconference meetings, and keeping personnel files. (Id. at 35.) She also handled correspondence for two people, maintained expense reports, performed filing duties, and assisted with special projects on an as needed basis. (Id. at 198.) Her work consisted of sedentary activities and required her to walk to the

12

elevator and take it to other floors in a 44-story building to pick-up mail or office supplies and arrange for meetings or conferences. (A.R. 35.) Polchow was not required to work more than a full-time schedule. (Id.)

Polchow testified that she was diagnosed with ITP in 2002 and was on sick leave from work for a couple of months. (Id. at 36.) She was treated with steroids and transfusions and noticed that her body weakened as a result. (Id.) When Polchow returned to work, she started getting sick again. (Id.) She would have burning sensations in her legs at night and would occasionally lose feeling in her legs during the day. (Id.) Polchow would often become sick and nauseous while driving. (Id.) She had a number of chronic ailments, including diarrhea, ear infections, sore throats, sinusitis and headaches. (Id. at 36-37.) She had dizzy spells and double vision. (Id. at 36.) After losing feeling in her body and having double vision one day at work, she saw Dr. Spurgash and went on sick leave. (Id. at 36-37.) Polchow testified that Dr. Spurgash told her, after being on sick leave for three months, that she needed to stop working. (Id. at 37.) Polchow, however, returned to CNA and worked half days for about two weeks until she stopped working in December 2007. (Id. at 34-35, 37.)

Polchow continues to have many of the same types of ITP symptoms even though the ITP is now in remission. (Id. at 37-38.) Her doctors told her that her body is weak because of the severity of the ITP and that she has to be very careful and take it easy. (Id. at 38.) Polchow could not have worked during the six months preceding the hearing because she

13

was at home taking care of herself. (A.R. 39.) On a typical day, she is lying down and resting in bed by 5:00 pm. (Id. at 39-40.) Polchow has constant back and leg pain that precludes her from lifting and standing for long periods of time. (Id. at 40.) She is unable to commit herself to any type of work because of her unstable immune system. (Id. at 40-41.) Polchow testified that she would not be able to do work that only requires answering telephones while sitting down because she has a pinched nerve in her right leg, constant tingling in both legs, and pain in her upper back after sitting for just 10 minutes. (Id. at 40-42.)

Polchow testified that since she stopped working in December 2007, she has more than one bad day per week. (Id. at 61-62.) On a bad day, she has fatigue, chills, ear pain, voice loss, nausea, leg weakness, and upper body sensations, and is completely bedridden. (Id. at 63-64.) Polchow explained that she was bedridden for a six-week period starting in January 2009 because of a chronic ear infection. (Id. at 64.) She cannot work because she experiences repeated episodes of sickness which cause her to be bedridden. (Id. at 66.)

Polchow lives with her son and he helps with most of the household chores. (Id. at 33, 43-44.) She is able to do laundry and occasionally load the dishwasher and dust the house. (Id. at 43-44.) Polchow walks a couple times a week for exercise and likes to walk at least 10 minutes around her condominium to get her "heart and blood going." (Id. at 44-45.) She does stretching exercises when walking becomes too strenuous for her. (Id. at 45.) Polchow uses a computer at home and pays her bills online. (Id. at 46.)

## C. Medical Expert's Testimony

After reviewing the medical evidence, Dr. Cavenagh testified that Polchow's medically determinable impairments include a history of ITP in remission and bilateral carpal tunnel syndrome with bilateral release surgery. (A.R. 48-51.) He explained that Polchow's history of ITP in remission would not result in longstanding immune deficiency that would be linked to her chronic respiratory infections or symptoms of nausea or diarrhea. (Id. at 56-58.) Polchow's ITP was very likely a temporary autoimmune disorder that did not lower her resistance to infection. (Id. at 58.) Dr. Cavenagh also opined that the numerous diagnostic tests did not show significant abnormalities, (id. at 49-51), but chronic sinusitis was documented by an MRI. (Id. at 57-58.)

Dr. Cavenagh testified that the medical records did not clearly support diagnoses of fibromyalgia or CFS. (Id. at 51-54.) He explained that the characteristic 14 of 18 tender points required for fibromyalgia were not documented in the records. (Id. at 51.) Dr. Cavenagh also pointed out that Dr. Fliegelman's differential diagnoses, including rheumatologic process (polymyositis vasculitis), systemic viral illness and CFS, meant that he was considering a number of possible diagnoses, but he had not been able to determine the appropriate diagnosis for Polchow's condition. (Id. at 52-54.) Dr. Cavenagh explained that there was no typical treatment protocol for CFS, (id. at 69), and that there was no correlation between CFS and a diagnosis of ITP, as the only danger from ITP is serious bleeding, (id. at 57-59). Dr. Cavenagh further opined that Polchow can perform light work,

which may require lifting 20 pounds occasionally and 10 pounds frequently. (A.R. 51, 54.)

He explained that she can stand, walk and sit for at least six hours in an eight-hour workday,

but that she cannot climb ladders or work around unprotected heights. (Id. at 54-55.)

### D.  Vocational Expert's Testimony

Geist testified that Polchow's past relevant work consisted of a job as an executive

administrative assistant. (Id. at 60.) She explained that, according to the Dictionary of

Occupational Titles ("DOT"), the executive administrative assistant job constitutes skilled

work performed at the sedentary level. (Id.)

The ALJ asked Geist two hypothetical questions about whether an individual of

Polchow's age, education and work experience who has certain physical limitations could

perform her past relevant work. (Id. at 69.) In the first hypothetical question, the individual

can perform light work, which entails lifting 20 pounds occasionally and 10 pounds

frequently, and standing, walking, and sitting about six hours in an eight-hour workday. (Id.)

The individual could not climb ladders, ropes or scaffolds, could not kneel, crouch or crawl,

and could not work at heights or around unprotected hazards. (Id.) And such an individual

would be limited to occasionally climbing stairs or ramps and occasionally stooping. (Id.)

In the second hypothetical question, the individual could lift a maximum of 10 pounds and

occasionally lift smaller items like tools, stand and walk for no more than two hours in an

eight-hour workday, and sit for at least six hours in an eight-hour workday, along with all the

same non-exertional limitations. (Id. at 69-70.) Geist concluded that the hypothetical

persons the ALJ described could perform Polchow's past relevant work as an executive administrative assistant.  (A.R. 69-70.)

Geist explained, however, that the nature of Polchow's occupation as an executive administrative assistant required a very strict adherence to the minimum absence requirements by employers.  (Id. at 70.)  An employer's customary tolerance regarding an employee's absence from work would be no more than two days per month in the private sector and no more than three days per month in the public sector.  (Id.)  Therefore, if an individual were unable to work one day out of a week, that individual would not be able to retain the executive administrative assistant job.  (Id. at 70-71.)

E.    The ALJ's Decision

On January 12, 2010, the ALJ issued a decision finding that Polchow was not disabled within the meaning of the Act.  (Id. at 11-22.)  The ALJ initially determined that Polchow met the insured status requirements under the Act through December 31, 2012.  (Id. at 13.)  Next, the ALJ found that Polchow had not engaged in substantial gainful activity since December 11, 2007, the alleged onset date of her disability.  (Id.)

The ALJ found that the medical evidence established that Polchow suffered from severe impairments, which included possible CFS, possible fibromyalgia, chronic sinusitis, and status post carpal tunnel syndrome surgery.  (Id. at 13-14.)  However, the ALJ determined that Polchow did not have an impairment or combination of impairments listed in or medically equal to one listed in the regulations.  *See* 20 C.F.R. § 404, Subpt. P, App. 1.

17

(A.R. 14.) The ALJ then assessed Polchow's residual functional capacity ("RFC") to determine what work she could perform despite her limitations. (Id. at 14-21.) The ALJ found that Polchow has the RFC to perform sedentary work. (Id. at 14.) The ALJ also determined that she can occasionally climb stairs or ramps and occasionally stoop. (Id.) But the ALJ found that Polchow cannot climb ladders, ropes or scaffolds, cannot kneel, crouch or crawl, and cannot work at heights or around unprotected hazards. (Id.)

In reaching this conclusion, the ALJ considered Polchow's testimony and extensive medical history. (Id. at 15-21.) The ALJ first found that Polchow's complaints of significant fatigue, weakness and frequent bouts of illness that she attributed to her history of ITP were not supported by the medical evidence. (Id. at 18.) According to Dr. Cavenagh and the other physicians' notes, Polchow was treated for this condition in 2002 and it was now in remission. (Id.) Dr. Cavenagh also testified that Polchow's history of ITP by itself did not provide a basis for her complaints of fatigue and frequent illness. (Id.) The ALJ next found that the severity of Polchow's symptoms of chronic sinusitis, fatigue, weakness and headaches were not corroborated by the various physicians' treatment notes. (Id.) For example, Polchow claimed that she was bedridden for six weeks in January 2009, but Dr. Oswiecimski's notes show only that she was treated in January, March, and June 2009, and do not mention such a significant illness. (Id. at 18-19.) The ALJ therefore concluded that the numerous treatment notes contained in the record failed to substantiate the extent or

severity of the limitations Polchow described in her testimony and discounted her credibility. (A.R. 21.)

In evaluating Polchow's diagnoses of fibromyalgia and CFS, the ALJ discussed Dr. Cavenagh's testimony that there was no objective medical evidence establishing these impairments. (Id. at 19.) The ALJ explained that there was insufficient evidence to support Dr. Curtin's diagnosis of fibromyalgia because Polchow did not have the characteristic 14 of 18 tender points. (Id.) She also noted that there was no objective evidence of CFS and Dr. Fliegelman's differential diagnosis appeared to be based on Polchow's subjective complaints. (Id.) The ALJ indicated that she was not entirely clear if there was sufficient medical evidence to find that CFS is a medically determinable impairment pursuant to Social Security Ruling ("SSR") 99-2p (used to evaluate cases involving CFS). (Id.) However, the ALJ gave Polchow the benefit of the doubt and assumed that fibromyalgia and CFS are medically determinable impairments that can cause the symptoms she alleged. (Id.) The ALJ further noted that Dr. Fliegelman's treatment notes did not corroborate the severity of Polchow's fatigue and that Dr. Curtin repeatedly indicated in his records that she was doing well. (Id.)

In assessing the various medical opinions, the ALJ first considered the opinions of the two state agency medical consultants who concluded that Polchow's impairments were not severe. (Id. at 19.) The ALJ found these opinions reasonable, but noted that Dr. Fliegelman's treatment notes were not included in the record when the medical

consultants rendered their opinions. (A.R. 19.) The ALJ then reviewed the opinions of Drs. Oswiecimski and Curtin who opined that Polchow was not capable of performing full-time work. (Id. at 20.) The ALJ gave little weight to these opinions because they were not well-supported or explained. (Id.) The ALJ found Dr. Cavenagh's opinion to be the most persuasive and reliable because he provided a detailed review of the evidence and described the specific medical findings that formed the basis of his opinion. (Id.)

The ALJ also considered Polchow's medications and daily activities and determined that these did not provide a basis for finding that she could not work. (Id. at 21.) Polchow did not require the use of a CPAP machine for her sleep apnea and she did not take medications for extreme fatigue. (Id.) The ALJ noted Polchow's very good work history, but determined it was not sufficient to overcome the record evidence. (Id.) The ALJ found that while the nature and frequency of Polchow's treatment indicate she has some limitations, they do not corroborate her allegations that her symptoms are severe enough to preclude her from working. (Id.)

The ALJ concluded that Polchow was capable of performing her past relevant work as an executive administrative assistant. (Id. at 21.) In reaching this conclusion, the ALJ relied on Geist's testimony that in accordance with the DOT, Polchow's job as an executive administrative assistant constitutes skilled sedentary work. (Id. at 22.) The ALJ found that Polchow did not have infections or fatigue severe enough or frequent enough to cause her to be absent from work two or more days per month. (Id.) Therefore, notwithstanding

Polchow's limitations, the ALJ determined that Polchow could perform her past work as it is actually and generally performed. (A.R. 22.)

## Analysis

Polchow seeks reversal of the ALJ's decision finding that she is not disabled. Upon review of the record and applying the applicable standards, the court finds that the ALJ's decision is supported by substantial evidence. The ALJ reasonably weighed the medical opinions, properly assessed Polchow's credibility, and appropriately relied on Geist's testimony that Polchow could perform her past work. Therefore, the court affirms the ALJ's decision in its entirety.

### A.    Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one: the court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether a plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the

Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *Id*.

While the standard of review is deferential, the court "must do more than merely rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted). In order for the court to affirm a denial of benefits, the ALJ must have articulated the reasons for the decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." *Id.* Although an ALJ need not address every piece of evidence, the ALJ cannot limit her decision to only that evidence which supports her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of her findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## B.    Five-Step Inquiry

To qualify for DIB under Title II, a claimant must establish that she has a disability within the meaning of the Act. 42 U.S.C. §§ 423(a)(1)(D), 1382(a). An individual is "disabled" if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); *Skinner v. Astrue*, 478 F.3d

836, 844 (7th Cir. 2007).  The Social Security Regulations set forth a five-step sequential

inquiry for determining whether a claimant is disabled.  The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe
> impairment or combination of impairments; (3) the claimant's impairment
> meets or equals any impairment listed in the regulations as being so severe as
> to preclude substantial gainful activity; (4) the claimant's residual functional
> capacity leaves [her] unable to perform [her] past relevant work; and (5) the
> claimant is unable to perform any other work existing in significant numbers
> in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citing 20 C.F.R.

§ 404.1520).

An affirmative answer to each step leads either to the next step or, at steps three and

five, to a finding that the claimant is disabled.  20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at

352.  A negative answer at any point, other than step three, terminates the inquiry and leads

to a determination that the claimant is not disabled.  20 C.F.R. § 404.1520; *Stein v. Sullivan*,

892 F.2d 43, 44 (7th Cir. 1989).  The claimant bears the burden of proof through step four.

*Briscoe*, 425 F.3d at 352.  If the first four steps are met, the burden shifts to the

Commissioner at step five.  *Id.*  The Commissioner must establish at step five that the

claimant—in light of her age, education, job experience and RFC to work—is capable of

performing other work and that such work exists in the national economy.  42 U.S.C.

§ 423(d)(2); 20 C.F.R. § 404.1520(f).

**C.    Medical Evidence**

Polchow contends that the ALJ made a number of reversible errors in evaluating and weighing the medical evidence. She first contends that the ALJ erred under the treating physician rule by not according controlling weight to the opinions of Dr. Oswiecimski and Dr. Curtin. (R. 16, Pl.'s Mem. at 9-12.) Dr. Oswiecimski and Dr. Curtin provided opinions supporting Polchow's disability claim because they reported that she was not capable of performing full-time work. (Id. at 10, A.R. 663, 666.) The Commissioner asserts that the ALJ reasonably declined to give controlling weight to their opinions because they did not properly explain or support their opinions. (R. 17, Def.'s Resp. at 8.) The Commissioner therefore avers that the ALJ appropriately relied on Dr. Cavenagh's opinion because he described the specific medical findings that formed the basis of his opinion. (Id.)

The court finds that the ALJ properly declined to give the opinions of Dr. Oswiecimski and Dr. Curtin controlling weight. The regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) it "is not inconsistent with the other substantial evidence" in the case. 20 C.F.R. § 404.1527(d)(2); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). If a treating physician's opinion is not entitled to controlling weight, it is afforded deference and must be weighed using the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the

supportability of the opinion, including medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating physician; and (6) any other factors which tend to support or contradict an opinion. 20 C.F.R. § 404.1527(d)(2)-(6). An ALJ may reject a treating physician's opinion if the opinion is unsupported or inconsistent with the evidence in the record. But, if the ALJ rejects the opinion, she must give a good reason. 20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

As discussed in *Hofslien v. Barnhart*, 439 F.3d 375 (7th Cir. 2006), a treating physician's opinion is not entitled to a presumption of correctness when opposing or contradictory evidence is introduced. In *Hofslien*, the Seventh Circuit rejected the claimant's argument that the ALJ erred by refusing to give controlling weight to the opinions of her treating psychologist because they were inconsistent with evidence from physicians who had never examined or treated the claimant. *Id.* at 376-77. The Seventh Circuit explained that the weight to be given to a treating physician's testimony depends on circumstances. *Id.* at 377. When the record contains well-supported evidence that contradicts his opinion, even if it is that of a nontreating or nonexamining physician, then the treating physician's opinion is not entitled to controlling weight and is "just one more piece of evidence for the administrative law judge to weigh." *Id.* at 376-77.

Here, the ALJ sufficiently explained her decision not to give the treating physicians' opinions controlling weight—Dr. Oswiecimski and Dr. Curtin failed to adequately explain

their opinions and their opinions were not well-supported by objective medical evidence. Dr. Oswiecimski opined that Polchow was not capable of performing a full-time job, but provided very little explanation other than a notation stating "secondary to above." (A.R. 20, 666.) She diagnosed peripheral neuropathy, but Polchow's most recent EMG and nerve conduction studies were normal and her clinical examinations showed no objective weakness or sensory abnormalities indicative of this disease. (Id. at 20, 665.) Dr. Oswiecimski's treatment notes also did not delineate any significant complaints or abnormalities that would preclude Polchow from performing full-time sedentary work. (Id.)

Dr. Curtin opined that Polchow was not capable of sustaining work on a full-time basis, but provided no explanation for his opinion. (Id. at 20, 663.) Dr. Curtin diagnosed fibromyalgia, however, there is no medical evidence documenting that Polchow has the characteristic 14 of 18 tender points required for this impairment. (Id. at 20, 662.) He indicated that Polchow is "limited in ability to exert herself over any period of time, i.e., average work," but did not explain what he meant by "average work." (Id.) And Dr. Curtin's treatment notes repeatedly indicated that Polchow was doing well. (Id. at 20.)

The ALJ determined that Dr. Cavenagh's opinion was the most persuasive because he provided a detailed review of the medical evidence and described the specific findings that formed the basis of his opinion. (Id.) For instance, Dr. Cavenagh explained that the numerous diagnostic tests did not show significant abnormalities. (Id.) He discussed Polchow's history of ITP and explained that it would not result in any longstanding immune

deficiency that is linked to her chronic infections. (A.R. 20.) Dr. Cavenagh also indicated that the record did not clearly support diagnoses of fibromyalgia and CFS because there was no objective medical evidence of these conditions. (Id. at 19.) Therefore, the ALJ reasonably gave less weight to the conclusory opinions of Polchow's treating physicians and accorded greater weight to Dr. Cavenagh's opinion. *Hofslien*, 439 F.3d 376-77 (the ALJ's decision to afford greater weight to the opinions of nonexamining physicians— as opposed to those of the treating psychologist— was supported by substantial evidence); *see also Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation"); *Dixon*, 270 F.3d at 1177 ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.")

The ALJ also considered the opinions of the two state agency medical consultants who also provided a good explanation for why Polchow's impairments were not expected to limit her ability to work. (Id.) While Polchow complains that the ALJ should not have relied on these opinions because they were rendered before much of the medical record was developed, (R. 16, Pl.'s Mem. at 12), the ALJ appropriately noted that Dr. Fliegelman's treatment notes were not included in the record at the time the state agency medical consultants reviewed the medical record, (A.R. 19).

Polchow next asserts that the ALJ erred by failing to consider all of her emergency room visits in 2006 and 2007. (R. 16, Pl.'s Mem. at 11.) She claims she sought emergency medical treatment on nine occasions in 2006 and on 11 occasions in 2007. (Id.) However, a review of the records establishes that Polchow visited the emergency room on only three occasions: February 7, 2006, (A.R. 310-19), July 27, 2007, (id. at 253-71), and October 12, 2007, (id. at 373-96). Polchow erroneously characterizes each trip she took to the hospital as an emergency when the record shows that these trips were for routine treatment, including office visits and diagnostic tests. (Id. at 257-59, 272-75, 280-84, 292-95, 298-99, 300-07, 320-22, 360-63, 397-405.) Because the ALJ discussed all three emergency room visits in her decision, she did not err by failing to consider relevant medical evidence. (Id. at 16.) To the extent Polchow claims the ALJ did not consider her other "problems," the ALJ thoroughly analyzed the medical records and discussed her symptoms, impairments, diagnoses, and treatment.

Polchow also contends that the ALJ did not consider all of the medications prescribed by Dr. Oswiecimski. (R. 16, Pl.'s Mem. at 10-11.) In her decision, the ALJ stated that Polchow took "medications for cholesterol, infections, sleep apnea, and has been prescribed Lyrica for peripheral neuropathy and/or weakness. These are appropriate medications, but do not suggest incapacitating symptoms." (A.R. 21.) While Polchow claims that the ALJ was required to list each of her medications by name, she cites no authority to support this proposition. The ALJ was not required to list or discuss all of Polchow's medications. *See*

*Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence"). To the extent Polchow claims the ALJ "played doctor" by inferring that her condition is not disabling because she does not take Provigil for extreme fatigue, this error is harmless given the overall strength of the record. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (remand a "waste of time" where it is "predictable with great confidence that the agency will reinstate its decision on remand").

Polchow avers that the ALJ failed to consider that Dr. Spurgash advised her to stop working in December 2007. (R. 16, Pl.'s Mem. at 11.) She explains that Dr. Spurgash also authorized her three-month leave of absence and her part-time work hours. (R. 18, Pl.'s Reply at 7.) However, there is no evidence in the record to establish that Dr. Spurgash recommended that Polchow stop working or even authorized a three-month leave of absence or part-time work hours. (A.R. 34-35, 37.) Indeed, in the middle of the alleged three-month absence, in October 2007, Polchow went to the hospital and reported that she had been working for the past two and a half weeks, but had been off from work for six weeks prior to that time because of a viral illness. (Id. at 375.) Here, Polchow never obtained any supporting documentation from Dr. Spurgash for the ALJ to consider. *See Glenn v. Secretary of Health & Human Servs.*, 814 F.3d 387, 301 (7th Cir. 1987) (an ALJ is entitled to assume that a claimant represented by counsel "is making h[er] strongest case for benefits").

Furthermore, contrary to Polchow's contention, the ALJ was not required to recontact Dr. Oswiecimski and Dr. Curtin for additional evidence or clarification regarding their treatment records or opinions. (R. 16, Pl.'s Mem. at 11.) An ALJ must recontact medical sources only when the evidence received is insufficient to determine whether a claimant is disabled. 20 C.F.R. § 404.1512(e). Here, there was adequate evidence for the ALJ to find that Polchow was not disabled. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (the ALJ did not need to recontact the claimant's treating physician because the record as a whole "was adequate for the ALJ to find [the claimant] not disabled").

Accordingly, the court finds that the ALJ thoroughly analyzed Polchow's medical records and appropriately articulated her reasons for rejecting or accepting evidence of disability. *See Villano v. Astrue*, 566 F.3d 558, 562 (7th Cir. 2009) (an ALJ "is not required to discuss every piece of evidence, but must build a logical bridge from the evidence to conclusion"). Because this court can follow the ALJ's reasoning and determine that her conclusions are supported by substantial evidence, the Commissioner is affirmed on this issue.

## D.    Credibility Finding

Polchow next argues that the ALJ did not properly assess her credibility as required by the regulatory factors set forth in SSR 96-7p and offered flawed reasons for finding her not credible. (R. 16, Pl.'s Mem. at 6-9.) She claims that the ALJ ignored significant medical evidence and did not consider many of her symptoms when she assessed her credibility. (Id.

at 7.)  Polchow also avers that the ALJ did not follow the requirements of SSR 99-2p in evaluating her diagnoses of fibromyalgia and CFS.  (Id. at 7-9.)  The Commissioner contends that the ALJ properly articulated her reasons for finding Polchow not credible.  (R. 17, Def.'s Resp. at 9-11.)  The Commissioner points out that the ALJ reasonably found that the medical evidence as well as the discrepancies in Polchow's testimony did not support her allegations of disabling symptoms.  (Id. at 10.)  The Commissioner further asserts that the ALJ properly evaluated Polchow's diagnoses of fibromyalgia and CFS because she limited her to sedentary work, instead of accepting Dr. Cavenagh's opinion that she is capable of performing light work.  (Id. at 9.)

The court finds that the ALJ properly assessed the credibility of Polchow's testimony at the hearing.  An ALJ's credibility finding will be afforded "considerable deference" and overturned only if it is "patently wrong."  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted).  "A credibility assessment is afforded special deference because an ALJ is in the best position to see and hear the witness and determine credibility."  *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted).  However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and the court has greater freedom to review it.  *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

SSR 96-7p instructs that the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2; *see also Brindisi ex. rel. Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003). Without an adequate explanation, neither the claimant nor subsequent reviewers will have a fair sense of how the claimant's testimony is weighed. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001). Therefore, where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," an ALJ's credibility determination will not be upheld. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Polchow first contends that the ALJ's credibility determination is flawed because, according to Polchow, she ignored the fact that Polchow visited the emergency room on nine occasions in 2006 and on 11 occasions in 2007. (R. 16, Pl.'s Mem. at 7.) However, as discussed *supra*, Polchow erroneously refers to each trip she took to the hospital as an emergency when the record establishes that these trips were for routine treatment. (A.R. 257-59, 272-75, 280-84, 292-95, 298-99, 300-07, 320-22, 360-63, 397-405.) Also, the record shows that she visited the emergency room on only three occasions: February 7, 2006, (id. at 310-19), July 27, 2007, (id. at 253-71), and October 12, 2007, (id. at 373-96). Because the ALJ discussed all three emergency room visits in her decision, (id. at 16), and thoroughly reviewed the extensive medical records in this case, she did not ignore relevant medical evidence when assessing Polchow's credibility.

Polchow asserts that the ALJ disregarded many of her symptoms, including her chronic infections, sinusitis, headaches, diarrhea, double vision, and body weakness. (R. 16, Pl.'s Mem. at 7.) Polchow argues the ALJ erroneously attributed these symptoms to ITP, a condition which has been in remission since 2002. (Id.) She complains that the ALJ did not consider the fact that she continued to have all of these symptoms, despite the remission of her ITP. (Id.) Contrary to her contention, the ALJ noted Polchow's ongoing symptoms, recognizing that Polchow "is still feeling weak and having diarrhea, and the doctor's [sic] have said her body has weakened." (A.R. 16, 18.) Polchow criticizes the ALJ for attributing these symptoms to ITP, but Polchow herself testified that her symptoms stem from her treatment for ITP. (Id. at 18, 36-38.) The ALJ properly discredited Polchow's description of the severity and frequency of these symptoms based on Dr. Cavenagh's testimony that Polchow's history of ITP did not provide a medical basis for her complaints of frequent illness. (Id. at 18, 20.) Dr. Cavenagh explained that ITP in remission would not result in any longstanding immune deficiency that would be linked to Polchow's chronic infections. (Id.)

Polchow argues that the ALJ failed to properly consider her testimony that she is unable to work a full eight-hour day and that she has more than one day per week when she must be on bed rest. (R. 16, Pl.'s Mem. at 7.) Polchow claims that Dr. Oswiecimski's and Dr. Curtin's opinions support her allegations because they opined that she cannot work on a full-time basis. (R. 18, Pl.'s Reply at 8.) But, as explained *supra*, the ALJ gave little weight to Dr. Oswiecimski's and Dr. Curtin's opinions because they were not explained or

33

well-supported by objective medical evidence. And the ALJ found that Polchow's allegations were not supported by the medical evidence because numerous diagnostic tests showed that Polchow did not have any abnormalities. (A.R. 18, 20, 21.) Nor do the treatment records support her testimony regarding the frequency and severity of her symptoms. (Id. at 18.) For example, Polchow testified that she was bedridden for six weeks in January 2009, however, this continuous illness was not documented in Dr. Oswiecimski's treatment notes. (Id.) While Dr. Oswiecimski's notes reflect that she saw Polchow in January, March, and June 2009, they do not indicate that she was sick for a six-week period. (Id. at 18-19.)

Polchow next avers that the ALJ failed to correctly state that Polchow worked half days rather than full days for two weeks after she returned from a three-month leave of absence because she was exhausted each day by noon. (R. 16, Pl.'s Mem. at 7.) While Polchow acknowledges that the ALJ documented her testimony pertaining to the three-month leave of absence, she is really complaining that the ALJ did not accurately report her testimony regarding her part-time work hours. (Id.) The ALJ was not required to discuss Polchow's part-time hours because the ALJ's decision did not hinge in any meaningful way on her ability to work during those two weeks. And to the extent Polchow criticizes the ALJ because she did not discuss her need for an ergonomic workstation due to her back problems, the ALJ was not required to discuss every scrap of evidence. *See Villano*, 566 F.3d at 562

(an ALJ "is not required to discuss every piece of evidence, but must build a logical bridge from the evidence to conclusion").

Polchow further contends that the ALJ did not follow the key requirements of SSR 99-2p in evaluating her diagnoses of fibromyalgia and CFS. (R. 16, Pl.'s Mem. at 8-9.) SSR 99-2p requires that CFS, similar to other impairments, be established through medical signs and laboratory findings. SSR 99-2p, 1999 WL 271569, at *1. While Polchow acknowledges that the ALJ discussed SSR 99-2p with Dr. Cavenagh at the hearing, she complains that his responses were ambiguous and that he failed to conclude that she suffered from CFS, even though her treating physician, Dr. Fliegelman found that diagnosis to be appropriate. (Id.) But the ALJ accepted Dr. Fliegelman's diagnosis of CFS and Dr. Curtin's diagnosis of fibromyalgia. (A.R. 19, 21.) The ALJ explicitly stated that she gave Polchow the benefit of the doubt and assumed that CFS and fibromyalgia were medically determinable impairments that caused the symptoms she alleged. (Id.) Because she relied on the medical findings reported by the treating physicians, the ALJ complied with SSR 99-2p. And even if the ALJ skirted the ruling, it is unclear how that harmed Polchow, since the ALJ accepted that Polchow suffered from fibromyalgia and CFS.

While the ALJ determined that Polchow suffered from fibromyalgia and CFS, she reasonably concluded that the record evidence did not support Polchow's description of the severity of her symptoms. The ALJ found that Polchow's daily activities, her "very good work history," and her testimony that she is in bed resting by 5:00 pm every day lent some

support to her allegations, but were not enough to overcome the medical evidence and discrepancies in her overall testimony. (A.R. 21.) Specifically, the ALJ observed that Dr. Fliegelman had only one recorded episode in which Polchow's fatigue was incapacitating and in others he described her condition as stable. (Id. at 19.) Moreover, Polchow did not have the characteristic 14 of 18 tender points required for fibromyalgia and her diagnoses lacked the support of objective evidence. (Id.) And treatment notes repeatedly indicated that Polchow was doing well. (Id.)

But even though the ALJ did not find Polchow's allegations fully credible, she gave some weight to Polchow's testimony regarding her fatigue and weakness and thus limited her to sedentary work. (Id. at 20-21.) The ALJ was not required to believe Polchow's allegations regarding the severity of her symptoms. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006) (noting that an ALJ is not "obliged to believe all [of a claimant's] testimony. Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case.") And Polchow has not provided this court with any evidence that fibromyalgia and CFS are *pe se* disabling. *See Sarchet*, 78 F.3d at 307 ("[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not."). Because her credibility finding is supported by substantial evidence and is not

"patently wrong," the Commissioner is affirmed on this issue.[1]  *See Prochaska,* 454 F.3d at

738.

**E.      Step Four Finding**

Polchow contends that the ALJ erred as a matter of law when she failed to develop

the record regarding the physical and mental demands of her past work as an executive

administrative assistant.  (R. 16, Pl.'s Mem. at 4-6.)  Polchow also claims that the ALJ erred

in relying on Geist's testimony because, according to her, there was an apparent conflict

between her testimony and the DOT's description of the executive administrative assistant

job that the ALJ failed to resolve.  (Id. at 5-6.)  The Commissioner points out that Polchow's

attorney did not object to Geist's analysis of Polchow's past work and failed to identify any

conflicts between Geist's testimony and the DOT, and thus argues that the ALJ reasonably

relied on Geist's testimony in finding that Polchow could perform her past work as it is

actually and generally performed in the national economy.  (R. 17, Def.'s Resp. at 12-15.)

The court finds that the ALJ reasonably relied on Geist's testimony and Polchow's

descriptions of her work in finding that she can perform her past work as an executive

administrative assistant.  Under step four, "if the claimant can still perform the claimant's

past relevant work given the claimant's [RFC], the claimant is not disabled."  20 C.F.R.

---

[1]  Because Polchow for the first time argues in her reply brief that the ALJ did not permit her
to develop the record with respect to her "bad days," she has waived this argument.  (R. 18,
Pl.'s Reply at 3-4.)  *See TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d
625, 630-31 (7th Cir. 2007) (noting that "it is well-settled that arguments first made in the
reply brief are waived.")

§ 404.1520(a)(4). A claimant will be found to be "not disabled" if it is determined that: (1) the claimant has the RFC to perform the "actual functional demands and job duties of a particular past relevant job"; or (2) the claimant has the capacity to perform the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61, 1982 WL 31387, at *2. Here, the ALJ compared the physical and mental demands of Polchow's past relevant work with her RFC finding and reasonably concluded that she could perform a job as an administrative assistant, which is defined as sedentary work by the DOT. In reaching this conclusion, the ALJ properly relied on Geist's testimony that Polchow could perform the demands of this job given her RFC and that her testimony was consistent with the DOT's description of the administrative assistant job.

Polchow, however, complains that the ALJ erred in relying on Geist's testimony because there was an apparent conflict between Geist's testimony and the DOT's description of the administrative assistant job. Under SSR 00-4p, "an ALJ has an 'affirmative responsibility' to ask whether a vocational expert's evidence 'conflicts with information provided in the DOT' before relying on that evidence to support a determination of nondisability." *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008) (quoting SSR 00-4p, 2000 WL 1898704, at *4). If the VE's testimony appears to conflict with the DOT, SSR 00-4p requires an ALJ to obtain "a reasonable explanation for the apparent conflict" before relying on that evidence to support a finding that a claimant is not disabled. *Id.* at 463.

The ALJ satisfied the first step because she asked Geist to specifically point out any inconsistencies between Geist's testimony and the information in the DOT. (A.R. 60.) Here, Geist did not mention any inconsistencies. Thus, the ALJ was not obligated to inquire about apparent conflicts because there were no obvious conflicts between Geist's testimony and the information in the DOT. Indeed, Polchow's attorney did not object to Geist's analysis of Polchow's past work and did not identify any conflicts between Geist's testimony and the DOT. The Seventh Circuit has stated:

> [T]he failure of [the claimant's] counsel to identify the conflicts at the time of the hearing is not without consequence. [The claimant] now has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT.

*Overman*, 546 F.3d at 463 (emphasis in original). The ALJ therefore did all that was required by SSR 00-4p.

Polchow claims that the ALJ also erred by relying on Geist's testimony that she could perform the assistant administrative job as defined by the DOT because her past work entailed more standing and walking than outlined in the DOT. (R. 16, Pl.'s Mem. at 5-6.) Polchow claims that her past work required walking for two and a half hours, standing for two and a half hours, and sitting for five hours, a total of 10 hours per day. (A.R. 198.) However, Polchow reported that she only worked eight hours per day and she testified that she was never required to work more than full-time. (Id. at 35.) Geist testified at the hearing that Polchow described her past work as consisting of two or three hours of walking or

standing, which is consistent with sedentary work.[2]  Therefore, because Geist testified that

Polchow performed her past work at the sedentary level, the ALJ properly concluded that

Polchow could return to her past work as she actually performed it.

The court also finds that, contrary to her allegations, Polchow's work as an executive

administrative assistant does not constitute a composite job.  A composite job is defined as

a job that "ha[s] significant elements of two or more occupations and, as such, ha[s] no

counterpart in the DOT."  SSR 82-61, 1982 WL 31387, at *2.  Polchow claims that her prior

work, as she performed it, did not precisely fit the DOT description.  But at the hearing,

Polchow never characterized her past relevant work as an executive administrative assistant

as a composite job that cannot be compared to other positions in the national economy.  Nor

has she identified any reason why her past relevant work differs significantly from similar

jobs defined in the DOT.

The ALJ therefore properly relied on Geist's testimony in finding that Polchow could

perform her past work as an executive administrative assistant as it is actually and generally

---

[2]  "Although a sedentary job is defined as one which involves sitting, a certain amount of
walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if
walking and standing are required occasionally and other sedentary criteria are met."  *See* 20
C.F.R. § 404.1567(a).  "'Occasionally' means occurring from very little up to one-third of
the time.  Since being on one's feet is required 'occasionally' at the sedentary level of
exertion, periods of standing or walking should generally total no more than about 2 hours
of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour
workday."  *See* SSR 83-10, 1983 WL 31251, at *5.

performed.  Because the ALJ's step four finding is supported by substantial evidence, the

Commissioner is affirmed on this issue.

## Conclusion

For the foregoing reasons, Polchow's motion for summary judgment is denied.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**